| | | |
|---|---|---|
| RAY K. HAYNES Ph.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:15-cv-01717-LJM |
| | ) | |
| INDIANA UNIVERSITY, | ) | |
| THE BOARD OF TRUSTEES OF | ) | |
| INDIANA UNIVERSITY, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER

Before the Court are various motions filed by both parties. Defendants have filed a Motion for Summary Judgment (Dkt. 66) and Motion to Strike Designation of Evidence Report of Dr. Laura W. Perna ("Motion to Strike") (Dkt. 117). Plaintiff Dr. Ray Haynes has filed a Motion for leave to File Surreply in Opposition to Defendants' Motion to Strike ("Surreply Motion") (Dkt. 148) and a Motion for Relief Under Rule 60 ("Motion to Reconsider") (Dkt. 165). Dr. Haynes, who is African American, has alleged that the Defendants racially discriminated against him when they denied him tenure. Dkt. 1. Defendants claim that Dr. Haynes has failed to establish any nexus between the denial of his tenure and his race. Defendants also ask the Court to strike Dr. Perna's expert report submitted with Dr. Haynes' Response in Opposition to Motion for Summary Judgment. Dkt. 94. The Court will address each motion in turn.

# I. <u>BACKGROUND</u>

## A. DR. HAYNES' APPOINTMENT

The facts most favorable to Haynes are as follows: Indiana University (the "University") hired Dr. Haynes on May 21, 2008, as an assistant professor in the Instructional Systems Technology Department (the "IST Department") of the School of Education. Dkt. 67 at 3. A portion of Dr. Haynes' salary was funded by the Strategic Recruitment Fund, the purpose of which is "to facilitate the recruitment of underrepresented minorities and women into the professoriate at Indiana University Bloomington, especially in areas where their presence has been traditionally marginalized." Dkts. 68-5; 68-6; 68-7. There are no African American males in the School of Education. Dkt. 102-5 at 29-30. Dr. Haynes' initial appointment was for three academic years from August 1, 2008, to May 31, 2011. Dkt. 68-10. The University reappointed Dr. Haynes in one-year terms from 2011 through 2015. Dkt. 68-12. Dr. Haynes was given a six-year probationary period at the end of which a tenure decision would be made. Dkt. 68-13. During his time there, Dr. Haynes was one of two African Americans in the School of Education on track for tenure. Dkt. 102-12 at 3.

The IST Department evaluated Dr. Haynes on an annual basis. Dkt. 68-11 at 32. The third-year review, which is conducted by a three-person review committee, "is an opportunity to obtain feedback on the tenure track faculty member's progress toward tenure." Dkt. 68-16 at 1. In Dr. Haynes' third-year review, the committee stated that "the consensus of the entire committee is that Dr. Haynes has not done an adequate job of providing evidence of having made sufficient progress toward tenure that we would expect for a faculty member completing his third full year at Indiana University." Dkt. 68-

15 at 1. It also noted that "should his performance and productivity not improve during the next three years … he will have an extremely difficult time making an adequate case for tenure and promotion." Dkt. 68-15 at 1. To improve, the committee recommended that Dr. Haynes increase the amount of empirical research pieces, rewrite his candidate statement, and provide evidence of continuous improvement in teaching. Dkt. 8-15 at 1-3.

## B. DR. HAYNES' EXPERIENCE AT THE UNIVERSITY

Dr. Haynes claims that he felt marginalized by the School of Education faculty and felt as though he was not a part of the "in" group. Dkt. 102-12 at 2-3. He also states that his assigned mentor, Barbara Bichelmeyer, was rarely available to him because of her academic appointments. Dkt. 102-12 at 3. Nonetheless, Bichelmeyer believed Dr. Haynes to be a "phenomenal classroom teacher" who "did an excellent job of being in the classroom and motivating his students." Dkt. 102-2 at 13. Bichelmeyer also indicated, however, that Dr. Haynes had issues "giving timely feedback to students in an online environment." Dkt. 102-2 at 13. Dr. Haynes felt that Dr. Thomas Brush, the chair of his department, had a "standoffish" disposition towards him. Dkt. 102-8 at 32.

## C. THE UNIVERSITY'S TENURE PROCESS

The standards for tenure at the Bloomington campus are set forth in the Guidelines for Tenure and Promotion Reviews at Indiana University Bloomington ("Guidelines"). Dkt. 68-20. The Guidelines set forth the mechanisms for reviewing a candidates tenure application and state, "Decisions about tenure and promotion are reached through the comprehensive and rigorous peer review of achievements and promise." Dkt. 68-20.

Candidates for tenure are evaluated on three areas: (1) research/creative activity; (2) teaching; and (3) service/engagement. Dkt. 68-20 at 3. To achieve tenure, a candidate must be rated excellent in one of the three categories and receive at least a satisfactory/effective rating in the other two. Dkt. 68-20 at 3. The University's School of Education maintains its own criteria for evaluating each category. Dkt. 68-19 at 7-8. To achieve an excellence rating in research, which is the area chosen by Dr. Haynes, requires "[e]vidence that the faculty member is beginning to establish a national and/or international reputation as an original contributor through research." Dkt. 68-19 at 7.

A tenure candidate and the department chair, in Dr. Haynes' case Dr. Brush, work together to assemble the candidate's dossier, which includes a curriculum vitae, a personal statement, and a list of twelve prospective external reviewers. Dkt. 68-20 at 4, 9. The Guidelines require submission of at least six evaluative letters from external reviewers. Dkt. 68-20 at 5. The external reviewers should be leaders in the candidate's field and hold an academic appointment at a peer institution. Dkt. 68-20 at 5.

The review process begins at the candidate's department, then proceeds to the school level, and then finishes at the campus level. Dkt. 68-20 at 1. A faculty review committee writes a substantive report evaluating the candidate's performance in research, teaching, and service, and votes to recommend or deny tenure. Dkt. 68-20 at 1. Following this report, the appropriate administrator (i.e. chair, dean, vice provost) provides a separate substantive evaluation and recommendation. Dkt. 68-20 at 1. Finally, the Vice Provost for Faculty & Academic Affairs prepares the final evaluation and recommendation for the Provost and the President of the University, who in turn make a recommendation to the Board of Trustees. Dkt. 68-20 at 1.

## D. DR. HAYNES' TENURE CANDIDACY

Dr. Haynes chose research as the performance area in which he believed he excelled. Dkt. 68-11 at 60. Dr. Haynes was to submit his curriculum vitae, a personal narrative statement, and a list of twelve external reviewers by April 13, 2013. Dkt. 68-14 at 141; Dkt. 68-12 at 157.

Dr. Haynes' initial list of twelve external reviewers was divided into two groups of six: (1) "Haynes' List of External Reviewers" and (2) "IST Department Chair's List of External Reviewers." Dkt. 68-4 at 201. Nonetheless, Dr. Haynes personally chose all twelve external reviewers on the list. Dkt. 68-11 at 65. Dr. Haynes submitted his dossier to Jane Kaho, assistant to Executive Associate Dean Joyce Alexander, on April 23, 2013. Dkt. 68-21.

Dr. Joyce Alexander was responsible for managing the tenure process but did not vote on tenure candidates. Dkt. 68-3 at 65-66. Her task was to "move the process along" but "not to pass judgment." Dkt. 102-1 at 97, 187. Part of her duties was to facilitate the external review process. Dkt. 68-3 at 67; 68-4 at 155-57. Dr. Alexander handled the external review process for both Dr. Haynes and Dr. Yonjoo Cho, another assistant professor in the IST Department who applied for tenure at the same time as Dr. Haynes. Dkt. 68-4 at 42; 68-11 at 55. After receiving Dr. Haynes and Dr. Cho's lists of twelve external reviewers, Dr. Alexander noticed that six of the names on each candidates' lists overlapped. Dkt. 68-4 at 35-36, 41. To avoid asking the same individuals to review both Dr. Cho and Dr. Haynes, Dr. Alexander assigned the overlapped reviewers to one candidate or the other. Dkt. 68-4 at 35, 39, 66-69. This left nine individuals for Dr. Haynes and nine individuals for Dr. Cho from whom to request a review. Dkt. 68-20 at 46.

On May 22, 3013, Dr. Alexander requested that Dr. Haynes and Dr. Thomas Brush submit additional names for potential external reviewers because only one of the nine individuals for Dr. Haynes agreed to write a review.  Dkt. 68-4 at 70-71, 206-07.  On June 5, 2013, Dr. Brush emailed Dr. Haynes to determine whether he had thought about any additional external reviewers for his case.  Dkt. 68-24 at 3.  Dr. Brush provided five names for Dr. Haynes to consider: (1) Dr. Patricia Hardre; (2) Dr. Doohun Lim; (3) Dr. Rob Branch; (4) Dr. Rita Richey; and (5) Dr. Andrew Gibbons.  Dkt. 68-14 at 249; Dkt 68-24, Ex. A.  In response, Dr. Haynes submitted his second list to Dr. Brush on June 7, 2013; the list included four of the individuals suggested by Dr. Brush (Dr. Hardre, Dr. Richey, Dr. Branch, and Dr. Gibbons), excluded Dr. Lim, and added Dr. Tonnette Rocco and Dr. Anthony Colella.  Dkt. 68-11 at 67-69, 72-75.  Dr. Brush forwarded this list to Dr. Alexander on June 8, 2013.  Dkt. 68-24 at 3.

On August 26, 2013, Dr. Alexander requested three more external reviewers for Dr. Haynes due to one reviewer backing out at the last minute.  Dkt. 68-4 at 100-01, 119; Dkt. 68-24 at 3.  Dr. Brush submitted the third list of external reviewers to Dr. Alexander on August 28, 2013, which included three individuals selected by Dr. Haynes and two suggested by Dr. Brush.  Dkt. 68-11 at 77-80; Dkt. 68-24, Ex. C.

Ultimately, six individuals accepted the invitation to review Dr. Haynes' application for tenure and submit an external review letter: (1) Dr. Frances Kochan; (2) Dr. Patricia Hardre; (3) Dr. Robert Branch; (4) Dr. Andrew Gibbons; (5) Dr. Tonette Rocco; and (6) Dr. Frederick Nafukho.  Dkt. 68-4, Ex. 70; 68-11 at 81.[1]

---

[1] Dr. Haynes claims that two of Dr. Brush's proposed external reviewers, Drs. Gibbons and Hardre, were known to have a negative reputation.  Dkt. 94 at 6.  Dr. Haynes cites only one email that states that Dr. Hardre's external review of Dr. Haynes was "pretty

The external reviewers stated, in part:

(1) **Dr. Kochan**: I cannot speak highly enough about the research work that Dr. Haynes has done. The quantity and quality of work are extraordinary; the breadth of the work is extensive; the importance of the work is without question. … I ranked his teaching as excellent, his service as very good, and his research as beyond excellent to superior. Dkt. 95-24 at 3-4.

(2) **Dr. Hardre**: The tenor of the candidate's personal statement communicates great effort to convince readers that his work is of a caliber higher than any other evidence offered places it. While claiming its excellence in subjective terms, he does not offer much standardized or comparable evidence of its meeting an objective standard. I would place this candidate's overall research performance in a grey area of clearly satisfactory, but not clearly excellent. I wish that I could find more to recommend this candidate, and he may indeed attain excellence and national leadership in his field, but considered in light of the criteria provided, and in comparison to candidates at peer institutions, he does not at this time appear clearly superior. Dkt. 95-25 at 3.

(3) **Dr. Branch**: Dr. Haynes' record of publications and presentations at scholarly forums in educational technology would be considered above average for a peer faculty member at most universities with which I am familiar. However, his scholarship in the area of human resources development exceeds expectations [and] should be regarded as exemplary. … Overall, Dr. Haynes has demonstrated an ability to teach, conduct research, advise students, develop program curricula, and provide service to the university and community. Dr. Haynes would have my enthusiastic support and promotion to the rank of Associate Professor if he were at the University of Georgia. Dkt. 96-1 at 2.

(4) **Dr. Rocco**: There is ample evidence in the materials provided to me to state that Dr. Haynes has achieved excellence in his research and is on his way to becoming a leader in mentoring research. The materials provided do not give me enough information to rate Dr. Haynes as excellent in teaching and service though I suspect that I might be so inclined if I had the necessary information. … Overall, I would recommend Dr. Haynes for tenure and promotion. Dkt. 96-2 at 3.

(5): **Dr. Gibbons**: Overall, I feel that a person with Dr. Haynes' performance record would receive tenure with rank advancement at schools comparable to Indiana University… Given my limited knowledge of HRD literature, I believe Dr. Haynes has

---

tough and with kind of an attitude" and that she is "incredibly harsh and repetitively so; almost unprofessionally." Dkt. 96-6. This email chain does not, however, establish anything to establish that Dr. Hardre was "known" to be a negative reviewer nor does it state anything relating to Dr. Hardre's reputation as a reviewer; rather, it reflects on her review of Dr. Haynes' dossier. Accordingly, the Court will disregard the assertion that Dr. Brush knew that these two individuals had negative reputations.

placed his work in a variety of reputable sources. … I feel Dr. Haynes has a promising future. I can support his application for tenure and rank advancement. Dkt. 96-3 at 1-2.

(6) **Dr. Nafukho**: I am familiar with Dr. Haynes' scholarly work … I can state without reservation that his work is positively impacting the fields of human resource development, management and higher education. … Dr. Haynes has identified a research focus that is critical to the success of the fields of HRD and Management. … Compared to his peers in the field of HRD …, his scholarly record is above average and in my opinion, would be promoted to the rank of Associate Professor with tenure in my own institution. Dkt. 96-4 at 2-3.

### E. IST DEPARTMENT REVIEW OF DR. HAYNES' APPLICATION

On September 6, 2013, the tenured faculty in the IST Department reviewed and voted on the merits of both Dr. Haynes and Dr. Cho's dossiers. Dkt. 68-4 at 130; Dkt. 68-25. Dr. Frank DiSilvestro presented Dr. Haynes' case, but had never presented a case for tenure prior to Dr. Haynes. Dtk. 68-11 at 59; Dkt. 100-7. Four of the tenured faculty voted in favor of tenure for Dr. Haynes and two voted against. Dkt. 95-14 at 2.

The next step was the recommendation of Dr. Brush, who was the Chair of the IST Department. Dkt. 68-11 at 104-05. Dr. Brush noted in his recommendation that the "committee noted some areas for improvement in both research and teaching, but the majority of the faculty in IST still believe that Dr. Haynes has met the criteria for promotion and tenure at Indiana University." Dkt. 68-26. He concluded that "the majority vote by the primary committee indicates that Dr. Haynes has attained excellence in research and satisfactory in teaching and service. I support the faculty recommendation to award promotion to Associate Professor with tenure to Dr. Haynes." Dkt. 68-26.

In early November 2013, upon Dr. Alexander's request, Dr. Brush submitted revised summaries of the votes for both Dr. Cho and Dr. Haynes' tenure applications. Dkt. 68-24 at 4. The summaries were approved by all IST Department members and

were added to the dossiers of each candidate.  Dkt 68-14 at 153-54, 157-58, 162, 212; Dkt. 68-27; Dkt. 68-24 at 4.

### F.  SCHOOL OF EDUCATION'S REVIEW OF DR. HAYNES' APPLICATION

In early October 2013, Dr. Haynes' dossier was reviewed and voted on by members of the School of Education Promotion, Tenure, and Contracts Committee (the "School Committee").  Dkt. 68-26 at 3.  The School Committee chose Dr. Krista Glazewski to present Dr. Haynes' case.  Dkt. 102-5 at 39.  Dr. Glazewski admitted that she was not "at all" familiar with Dr. Haynes' specialty.  Dkt. 96-11 at 1.  The School Committee voted six against and three for granting tenure to Dr. Haynes.  Dkt. 68-29.

On October 22, 2013, the School Committee prepared a written memorandum of its findings and submitted it to the Dean of the School of Education, Gerardo Gonzalez. Dkt. 68-29 at 1.  The memorandum noted that, with respect to research, the School Committee voted six to three against tenure and stated, "Dr. Haynes has published eight peer-reviewed publications (five as first author) and three book chapters" but also "questioned the extent of Dr. Haynes's impact based on low citation numbers and low numbers of publications in high-quality journals."  Dkt. 68-29 at 5-6, 9.  The School committee had the same vote with respect to teaching, noting that "Dr. Haynes's teaching evaluations have been mixed, and particularly low in the online courses."  Dkt. 68-29 at 6-7.  The School Committee further explained that "his evaluations have not shown significant improvement over the years and comments from some students indicated that Dr. Haynes sometimes is unresponsive to emails and questions about course

assignments." Dkt. 68-29 at 7. Finally, the School Committee gave Dr. Haynes a satisfactory rating in service. Dkt. 68-29 at 8. [2]

On November 20, 2013, after conducting his own independent review, Dean Gonzalez prepared a detailed written summary of his findings and recommended against granting Dr. Haynes tenure. Dkt. 68-31. Dean Gonzalez concluded that Dr. Haynes did not satisfy the criteria for tenure in research and teaching. Dkt. 68-3 at 193; Dkt. 68-31.

## G. DR. HAYNES' REBUTTAL EVIDENCE

On November 20, 2013, Dr. Alexander drafted the initial letter from Dean Gonzalez to Dr. Haynes denying him tenure and requested that Dean Gonzalez edit it. Dkt. 96-51. Dean Gonzalez replied on November 26, 2013, "Sorry for the delay in getting back to you on this one. I've really had to think about it, but in the end I just had to agree with the majority of the School's Committee. … Let's hold it as long as we can to see if anything new emerges." Dkt. 97-18 at 1. On December 10, 2013, Dean Gonzalez informed Dr. Haynes that he and the School Committee voted against his tenure. Dkt. 97-19.

Following the denial, Dr. Haynes submitted a 47-page document titled "Additional Information Related to Research & Teaching" to explain why "the negative review was

---

[2] Dr. Haynes cites to a prior memorandum drafted by the School Committee on October 8, 2013, but fails to provide any significance for mentioning it. Dr. Haynes claims that Dr. Glazewski "fundamentally altered the [School Committee]'s report, changing the vast majority of its positive statements to negative or neutral statements." Dkt. 94 at 13. Dr. Haynes also notes that the votes changed between the drafts of the report, noting that the vote was "1 excellent to 8 very good for research but changed by the final draft to 3 excellent, 5 very good/highly satisfactory, and 1 satisfactory; and Haynes's teaching … was reversed from 6 votes for satisfactory and 3 votes for unsatisfactory to 3 votes for satisfactory and 6 votes for unsatisfactory." Dkt. 94 at 13. Dr. Haynes fails, however, to demonstrate any import that these changes had on his case, since it would appear that the reason for his tenure denial, his research, was given a greater assessment in the final memorandum.

erroneous." Dkt. 68-12 at 189-93. He also submitted a second 15-page document to specifically address his teaching. Dkt. 68-12 at 200-01. Dr. Alexander advised Dr. Haynes that the earlier reviewers would receive any supplemental information to his dossier and would have the opportunity to change their vote. Dkt. 68-13, Ex. 13. The Department and the School Committee members received the new information for consideration, but none of them changed their votes as a result of the supplemental materials. Dkt. 68-24 at 4.

## H. UNIVERSITY REVIEW

Following Dean Gonzalez's negative recommendation, the University-wide Tenure Advisory Committee ("Tenure Committee"), headed by Vice Provost for Faculty and Academic Affairs Thomas Gieryn, reviewed Dr. Haynes' dossier. Dkt. 68-32. All nine members of the Tenure Committee voted against granting Dr. Haynes tenure. Dkt. 68-32 at 2. The Tenure Committee noted that Dr. Haynes' case was "presented on the basis of excellence in research," but none of them found that Dr. Haynes' research reached that level (votes on research: 3 very good, 4 satisfactory, and 2 unsatisfactory). Dkt. 68-32 at 2. Moreover, eight of the nine members on the committee found Dr. Haynes' teaching to be ineffective. Dkt. 68-32 at 2.

Next, Gieryn himself reviewed Dr. Haynes' dossier. Dkt. 68-12 at 19; Dkt. 98-33 at 2-3. Gieryn concentrated his evaluation on Dr. Haynes' research. Dkt. 68-34 at 2. Gieryn noted that "it is impossible to conclude that [Dr. Haynes'] research meets the standard of Excellence. Pooling all votes and recommendations together, 18/26 people evaluate the research as less than Excellent." Dkt. 68-34 at 2. Gieryn noted, "Concerns about the quantity of peer-reviewed publications, the stature of journals where they are

published and their demonstrated impact/influence are raised in the external letters and continue at every level of review." Dkt. 68-34 at 2. After reviewing Dr. Haynes' dossier and the reports from the external reviewers, Gieryn concluded, "I evaluate the candidates' research to be Very Good, falling short of the Excellence needed for a positive tenure and promotion decision." Dkt. 68-34 at 3.

In a letter dated March 26, 2014, Gieryn wrote to Dr. Haynes to inform him that his tenure was not recommended to the Board of Trustees and that his appointment would end May 2015. Dkt. 68-35 at 2. Gieryn stated, "President McRobbie, Provost Robel and I relied heavily on reviews prepared by faculty committees and also on the opinions of administrators who evaluated your dossier." Dkt. 68-35 at 2.

## I. GRIEVANCE

On May 27, 2014, Dr. Haynes submitted a 104-page grievance with an attached 43-page appendix to the Faculty Board of Review ("Review Board"). Dkt. 68-37 at 3. The Review Board "decide[s] whether evidence supports the conclusion that procedural irregularities had consequences for the legitimacy of the outcome, and if so, they may make suggestions for remediation to the Provost." Dkt. 68-20 at 2. Dr. Haynes did not indicate anywhere in his grievance that his race played a role in the decision to deny him tenure. Dkt. 68-13 at 2.

In an August 4, 2014, memorandum, the Review Board discussed each of Dr. Haynes' alleged grievances and concluded that none had merit. Dkt. 68-38. On August 19, 2014, Dr. Haynes submitted a response to the Review Board's findings titled "Corrections to Matters of Fact," but the submission did not change the recommendation of the Review Board. Dkt. 68-39; Dkt. 68-37 at 3.

On September 22, 2014, Dr. Haynes was notified that Provost Robel accepted the Review Board's decision and recommendation and therefore no further action would be taken with respect to his grievance. Dkt. 68-37 at 3.

## J. APPEAL TO UNIVERSITY'S PRESIDENT

On March 17, 2015, Dr. Haynes submitted an appeal to President Michael McRobbie and for the first time alleged that his denial of tenure was a result of racial discrimination. Dkt. 68-41. President McRobbie denied Dr. Haynes' appeal and Dr. Haynes' appointment with the University ended in May 2015. Dkt. 68-13 at 6; Dkt. 68-35.

## K. DRS. CHO AND LEFTWICH

Dr. Yonjoo Cho, who is not African American, had more publications than Dr. Haynes and received a unanimous vote for tenure at all levels of review.[3]

Dr. Anne Leftwich, who is not African American, had sixteen publications listed on her dossier presented for tenure but only four were independent of her mentors at Indiana or Purdue University. Dkt. 99-16 at 85-92. One of Dr. Leftwich's external reviewers found that "[g]iven that so few of her publications to date are singly authored, it is difficult to determine whether Dr. Leftwich's facility with collaborative research and writing with both faculty and students overshadows her unique individual contributions to educational

---

[3] Dr. Haynes claims that Dr. Cho was "less independent" than Dr. Haynes and cites to the report discussing Dr. Cho's tenure case, which states in part "that Dr. Cho had numerous publications that were more focused on summarizing research of other scholars and promoting 'models' that lacked much empirical foundation." Dkt. 99-7 at 6. The report concluded, however, that "the overall view of the faculty regarding Dr. Cho's research productivity and scholarship was highly positive and as the discussion concluded, the faculty seemed to be in consensus that Dr. Cho's work to date merited an excellent rating." Dkt. 99-7 at 6. Dr. Haynes also broadly claims that Dr. Cho received "negative teaching evaluations" that were glossed over at all levels of review, but fails to provide any analysis in this regard and therefore this unsupported allegation is disregarded.

technology research." Dkt. 99-16 at 55. The same reviewer concluded, however, that her "review of Dr. Leftwich's work suggests that it is methodologically sound and well-triangulated, well-grounded in existing literature, clearly communicated, and useful to other researchers in application of its findings." Dkt. 99-16 at 55. Dr. Lefwich received a unanimous vote for tenure at all levels of review. Dkt. 99-16 at 1.

## M. CHARGE OF DISCRIMINATION AND LAWSUIT

On April 10, 2015, Dr. Haynes filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Dkt. 1-1. He then filed this lawsuit on October 29, 2015. Dkt. 1. The Complaint alleges race discrimination under Title VII, race discrimination pursuant to 42 U.S.C. § 1981, and breach of implied covenant of good faith and fair dealing.[4] Dkt. 1.

## II. <u>SUMMARY JUDGMENT STANDARD</u>

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990). Motions for summary judgment are governed by Federal Rule of Civil Procedure 56(a), which provides in relevant part: The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

---

[4] In his Statement of Claims, Dr. Haynes stated that he will not be pursuing his claim related to a breach of the implied duty of good faith and fair dealing at trial. Dkt. 116 at 4. Therefore, the Court will only address Dr. Haynes' discrimination claims.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a fact either is or cannot be genuinely disputed. Fed.R.Civ.P. 56(c)(1). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986); *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992, 997 (7th Cir.1996). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence. *See Bombard v. Ft. Wayne Newspapers, Inc.,* 92 F.3d 560, 562 (7th Cir.1996).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm,* 94 F.3d 254, 257 (7th Cir.1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson,* 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 273 (7th Cir.1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir.1992). If the moving party does not have the ultimate burden of proof on a claim, it is sufficient for the moving party to direct the court to the lack of evidence as to an element of that

claim. *See Green v. Whiteco Indus., Inc.,* 17 F.3d 199, 201 & n. 3 (7th Cir.1994). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir.1996).

## III. <u>DISCUSSION</u>

## A. COLLATERAL MOTIONS

Prior to addressing the merits of Dr. Haynes' discrimination claims, the Court must first address four pending issues: (1) Defendants' Motion to Strike (Dkt. 117); (2) Dr. Haynes' Surreply Motion (Dkt. 148); (3) Dr. Haynes' Surreply in Opposition to Defendants' Motion for Summary Judgment and Motion to Strike ("Surreply in Opposition") (Dkt. 160); and (4) Dr. Haynes' Motion to Reconsider (Dkt. 165).

### 1. <u>Motion to Strike</u>

Pursuant to Federal Rule of Evidence 702, Defendants have moved to strike the declaration of Dr. Laura W. Perna (Dkt. 102-14), which Dr. Haynes attached to his response to Defendants' motion for summary judgment. Defendants do not challenge Dr. Perna's credentials, but rather claim that her opinions are inadmissible.

In her declaration, Dr. Perna states that she "was engaged as an independent expert to evaluate whether Dr. Haynes's tenure process involved any procedural irregularities and to compare his qualifications for tenure with that of [Dr. Leftwich]." Dkt. 102-14 at 3. Dr. Perna concluded in her declaration that "[Dr.] Haynes' research record is at least comparable to that of [Dr. Leftwich]. If [Dr. Leftwich]'s record demonstrated 'excellence' in research, then so does the record of [Dr.] Haynes." Dkt. 102-14 at 4. Dr. Perna also concluded "that various aspects of the promotion and tenure process were not

appropriately executed for [Dr.] Haynes. Particularly problematic is the selection of his external reviewers." Dkt. 102-14 at 4.[5]

With respect to her conclusion that Dr. Haynes' research was at least comparable to Dr. Leftwich, Dr. Perna did a "comparative assessment of research excellence." Dkt. 102-14 at 5. This assessment considered the quantity of material produced by both Dr. Haynes and Dr. Leftwich and considered the number of: (1) peer-reviewed journals; (2) independent lines of research; (3) research as books, book chapters, and conference presentations; and (4) peer-reviewed journal articles. Dkt. 102-14 at 5-7. Dr. Perna also noted that both Dr. Haynes and Dr. Leftwich received awards for papers and had research entered into journals with high impact factors. Dkt. 102-14 at 6. Finally, Dr. Perna summarized the amount of grants each procured and whether they did so independently or as part of a collaboration. Dkt. 102-14 at 6-7.

Dr. Perna also reviewed various aspects of Dr. Haynes' external review. She first noted that the "Vice Provost's Tenure and Promotion Recommendation raises questions about 'the probative value of the external letters[,]'" noting that it was not Dr. Haynes' responsibility to secure qualified reviewers and Bichelmeyer stated in an email that she "dropped the ball on external reviewers for Ray."[6] Dkt. 102-14 at 7. Dr. Perna also concluded that Dr. Brush "failed to encourage Haynes to select reviewers who are at different institutions," citing an email from Dr. Brush to Dr. Haynes recommending

---

[5] In the attached exhibit to Dr. Perna's declaration, which sets out more fully the evidence considered in making her declaration, Dr. Perna succinctly reviewed Dr. Haynes' teaching performance. She does not, however, in either her declaration or the attached exhibit, provide a conclusion for her analysis or tie it in to her declaration. *See* dkt. 102-14 at 8-9. Accordingly, it will not be considered in the Court's analysis.

[6] The actual email passage states that Bichelmeyer "dropped the ball on external reviewers for Ray *and Yonjoo.*" Dkt. 100-13 at 1 (emphasis added).

professors that are part of strong programs and who have strong academic credentials despite not being peer institutions. Dkt. 102-14 at 7. Dr. Perna then states that "[a]vailable evidence raises questions about the qualifications of external reviewers that Joyce Alexander selected as external reviewers" and cites to various emails from Dr. Alexander to potential external reviewers who believed themselves either unqualified to render an opinion on Dr. Haynes' specialty or no longer active in the field. Dkt. 102-14 at 7-8. Dr. Perna also took issue with "why [Dr. Hardre] was selected" as an external reviewer, noting one member of the faculty group's opinion that Dr. Hardre tended toward hyperbole and did not know much about Dr. Haynes' area of specialization. Dkt. 102-14 at 8. Finally, Dr. Perna took issue with Dean Gonzalez's characterization of Drs. Branch and Nafukho's external reviews as a "mixed assessment[,]" claiming that both of the doctors provided a positive review of Dr. Haynes' dossier. Dkt. 102-14 at 8.

Before proceeding to the merits, the Court must address two contentions raised by Dr. Haynes. Dr. Haynes first claims that the Defendants' Motion to Strike is procedurally improper pursuant to Local Rule 56-1(i), which states, "The court disfavors collateral motions – such as motions to strike – in the summary judgment process. Any dispute over the admissibility or effect of evidence must be raised through an objection within a party's brief." Although motions to strike are typically disfavored, Defendants adequately raised their objection in their reply brief and filed their Motion to Strike on the same day. *See* dkt. 120 at 3 n.3. Accordingly, the Court finds no error.

Dr. Haynes also claims that Defendants are required to show prejudice in filing a motion to strike, citing Rule 12(f). Dkt. 139 at 4-5. Rule 12(f) states that "the court may strike from a pleading any … redundant, immaterial, impertinent, or scandalous matter."

Defendants' Motion to Strike, however, is not predicated on any of these grounds; it seeks to preclude inadmissible testimony from Dr. Haynes' expert. Therefore, this argument is without merit.

Defendants claim that Dr. Perna's opinions are both unreliable and irrelevant and therefore fail to meet the admissibility standard for expert testimony. Dkt. 117 at 2. Rule 702 states as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Court follows a two-prong framework: the Court must determine whether "(1) the proposed witness would testify to valid scientific, technical, or other specialized knowledge[,] and (2) [whether] his testimony will assist the trier of fact." *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004) (quotations and citations omitted). "Expert testimony which does not relate to any issue in the case is not relevant[.]" *Daubert*, 509 U.S. at 591 (citations and quotation marks omitted).

The proponent of the expert testimony bears the burden of establishing the admissibility of the expert opinion by a preponderance of the evidence. *Daubert*, 509 U.S. at 592. "The principles set forth in *Daubert*, which addressed scientific testimony, apply equally to non-scientific fields." *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 805-06 (7th Cir. 2013) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999)). Regardless of the nature of the witness' expertise, Rule 702: (1) establishes a

standard of evidentiary reliability; (2) requires a valid connection to the pertinent inquiry as a precondition to admissibility; and (3) mandates that the testimony have a reliable basis in the knowledge and experience of the relevant discipline. *Id.*

Defendants first claim that Dr. Perna's comparison of Dr. Leftwich's research credentials is irrelevant to the material aspects of this case. Dr. Haynes responds that "Dr. Perna's testimony goes to the heart of the determination of whether Dr. Haynes was treated differently than other similarly situated tenure candidates." Dkt. 139 at 13. Dr. Perna readily admits in her declaration that she is "not an expert in Dr. Haynes' content area," which might explain why Dr. Perna only compares the quantity, rather than the quality, of the research done by both Dr. Haynes and Dr. Leftwich. Dkt. 102-14 at 5. But simply counting the amount of works by each candidate is not something that necessitates an expert's "specialized knowledge." Fed. R. Evid. 702. Dr. Perna offers no substantive analysis in her review of either candidate's work and makes the assumption that the two candidates were equally qualified based on the number of works generated, despite Dr. Perna's own acknowledgement that the University has emphasized "[q]uality of production is considered more important than mere quantity." Dkt. 102-14 at 5-6. The Guidelines state: "Evaluations of research can never be reduced to a simple metric: judgments about the quality of work, and its influence, impact, utility and creativity cannot be fully captured by the count of publications and citations or by a journal impact fact." Dkt. 97-12 at 6. They further state, "Faculty members and administrators must fully engage the candidate's work, and reach their own judgments about its worth." Dt. 97-12 at 6. Pursuant to the Guidelines, simply counting the number of work between the two candidates is not enough to provide an accurate analysis. Dr.

Perna's report does nothing to evaluate the quality of works as between Dr. Haynes and Dr. Leftwich and therefore is neither relevant nor "assist[s] the trier of fact" in making a comparison of the candidates' qualifications.  *Ammons*, 368 F.3d at 816.

Dr. Perna's opinion on the external reviewers suffers the same fate.[7]  Dr. Perna's report states that "various aspects of the promotion and tenure process were not appropriately executed for Haynes.  Particularly problematic is the selection of his external reviewers."  Dkt. 102-14.  To render this conclusion, Dr. Perna critiques various emails and reports submitted with Dr. Haynes' tenure, but fails to draw on any "specialized knowledge" that would be useful to a trier of fact.  Fed. R. Evid. 702.  Dr. Perna's opinions offer nothing that a jury could not comprehend on its own.  The purpose of expert testimony is to help the jury with "issues that laypeople would have difficulty resolving on their own."  *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013).  Although Dr. Perna has "participated in or consulted on approximately 100 tenure reviews at multiple universities[,]" she uses none of this knowledge in reaching her conclusions and contributes nothing new to the analysis.  Dkt. 102-14 at 3.  Laypeople are well-equipped to evaluate this evidence to determine whether Dr. Haynes' tenure process was done properly.  Dr. Perna's testimony related to the external reviewers is irrelevant.

Accordingly, Defendants' Motion to Strike is **GRANTED**.

## 2. Surreply Motion

Dr. Haynes filed his Surreply Motion seeking to reply to Defendants' allegedly new argument that "Dr. Perna as a witness should be excluded at summary judgment and

---

[7] The Court notes that the Defendants sought to strike Dr. Perna's opinion on the selection of external reviewers as unreliable.

trial." Dkt. 148 at 1-2. Dr. Haynes claims that the Defendants' assertion that Dr. Perna should be excluded as a witness at trial is a new argument to which they should be entitled to respond. Because Dr. Haynes' claims fail on the merits, *see infra* pt. III, B, his Surreply Motion is **DENIED as MOOT**.

### 3. <u>Surreply in Opposition</u>

On July 31, 2017, the Court issued an order allowing Dr. Haynes to submit a surreply to respond to: (1) new allegations in Defendants' counsel's affidavit; and (2) Defendants' argument on qualified immunity. Dkt. 157. The Court admonished Dr. Haynes that "any evidence in the surreply must be limited to the affidavit and the qualified immunity arguments and any extraneous evidence will be stricken completely." Dkt. 157 at 8. The Court accepts the argument on Defendants' claim that Dr. Haynes' case is time barred as well as the evidence designated by Dr. Haynes in support of his surreply as to Defendants' counsel's affidavit, which consists of a declaration made by Dr. Haynes. Dkt. 161-4.

With respect to the qualified immunity argument, Dr. Haynes once again takes the opportunity to try and admit the full expert reports of Drs. Greenwald and Perna. *See* dkts. 131, 132. "The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013) (citation and quotation marks omitted). "The doctrine of qualified immunity shields from liability public officials who perform discretionary duties." *Chelios v. Heavner*, 520 F.3d 678, 690-91 (7th Cir. 2008) "The defense provides 'ample room for mistaken judgments' and protects all but the 'plainly incompetent and

those who knowingly violate the law.'" *Id.* at 690 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

Dr. Haynes first offers the expert opinion of Dr. Perna, which concludes that "Dr. Haynes' record did not receive a fair and substantive evaluation on its academic merits. Instead, the tenure and promotion process for Dr. Haynes was executed in a way that seemingly pre-determined the result to deny tenure to Dr. Haynes." Dkt. 161-2 at 22-23. Dr. Haynes cites to Dr. Perna's full expert report to claim that "[e]ach individual Defendant was involved in sabotaging Dr. Haynes's tenure application and thus violated the law." Dkt. 160 at 13. But nothing in Dr. Perna's report sets forth any indication that any individuals "knowingly violate[d] the law." *Chelios*, 520 F.3d at 690. Dr. Perna's full expert report merely points out irregularities during Dr. Haynes' tenure review that she deems "improper" and "problematic." Dkt. 160 at 13-14. These observations, in addition to being irrelevant, *see supra* pt. III, A, 1, do not relate to whether or not any of the individual Defendants knowingly violated Dr. Haynes' constitutional rights and, pursuant to this Court's July 31, 2017, Order, are hereby stricken. Dkt. 161-2

Dr. Haynes also proffers Dr. Greenwald's full expert testimony to establish that the "individual Defendants' denial of Haynes's tenure application was, at minimum, plainly incompetent because the individual Defendants' implicit bias affected their tenure decision against Haynes." Dkt. 160 at 17. Dr. Haynes fails, however, to explain how any implicit bias by the individual Defendants could render their actions "plainly incompetent." If anything, this type of bias would be protected under the qualified immunity doctrine, which "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate

23

the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks and citation omitted). Thus, Dr. Greenwald's expert report fails to address Defendants' qualified immunity argument and, pursuant to this Court's July 31, 2017, Order, is hereby stricken.

### 4. **Motion to Reconsider**

On August 11, 2017, Dr. Haynes filed his Motion to Reconsider pursuant to Rule 60. Dkt. 165. "Motions to reconsider serve a limited function, to be used 'where the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension.'" *Davis v. Carmel Clay Sch.*, 286 F.R.D 411, 412 (S.D. Ind. 2012) (quoting *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990)) (additional quotations omitted). The Court may grant a motion to reconsider if a movant demonstrates a manifest error of law or fact, but a motion to reconsider is not to be used to make new arguments. *See In re Prince*, 85 F.3d 314, 324 (7th Cir. 1996).

Dr. Haynes makes the following requests in his Motion to Reconsider: (1) reconsider the denial of Dr. Haynes' request to supplement the record with expert testimony; (2) permit the use of Dkt. 131-1, which the Court excluded for Dr. Haynes' failure to cite it in his brief; (3) allow Dr. Haynes to respond to Defendants' cat's paw theory; (4) consider evidence regarding the gender of one of the professors listed in an affidavit; and (5) admit Dr. Haynes' expert reports to respond to Defendants' qualified immunity arguments.

Dr. Haynes first blames the Court for his own failure to timely gather expert testimony to respond to Defendants' Motion for Summary Judgment. Dr. Haynes claims

that "the constricted briefing timeline set by the Court prevented Dr. Haynes from using his expert reports in his response." Dkt. 165 at 6. Yet, as the Court made clear in its July 31, 2017, Order denying his Motion to Supplement, Dr. Haynes failed to timely raise this issue with the Court or request additional time to respond to Defendants' Motion for Summary Judgment, which resulted in the predicament he now faces. Dkt. 157 at 6-7. Rather than take the "it's easier to ask forgiveness than permission" approach, Dr. Haynes should have informed the Court, and the Defendants, of the need for more time to gather his expert testimony so that the issue could be addressed in a timely manner, but he failed to do so. Accordingly, his request to reconsider the Court's prior decision on this issue is **DENIED**.

Dr. Haynes then claims that his Motion to Supplement "simply sought to add [Dkt. 131-1] that was missing from his Designation of Evidence." Dkt. 157 at 9. Dr. Haynes states that he "was not aware that he needed to provide a pinpoint cite in his Response to the location of a citation to an exhibit in a prior brief that had been inadvertently omitted from his Designation of Evidence." Dkt. 165 at 9. Although it is not a requirement for a party to provide such a pinpoint cite, it would behoove Dr. Haynes to point out what part of the 15 pages of evidence contained in Dkt. 131-1 that is relevant to his discrimination claim and also inform the Court where such evidence is cited in his 37-page response brief. Nonetheless, the Court will accept this email chain as evidence on the merits of Dr. Haynes' claims. The Court reminds Dr. Haynes that it is not required to "hunt[] for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

Dr. Haynes next cites the "cat's paw" argument raised in his Motion for Surreply. Dkt. 165 at 10-12. Dr. Haynes makes the same arguments in his Motion to Reconsider

that the Court rejected in its July 31, 2017 Order.  Dr. Haynes has failed to present any manifest error of law or fact and, therefore, this argument is rejected.

Dr. Haynes also claims that he "discovered that Defendants' offered affidavit from Jane Kaho was misleading."  Dkt. 165 at 12.  Dr. Haynes notes that Kaho's affidavit, which relayed information on the number of African Americans at the School of Education, did not indicate the gender of each faculty member.  Dr. Haynes notes a discrepancy with one of the individuals he believed to be a male, but who is actually a female.  Dr. Haynes also points out that one African American male on Kaho's affidavit "belongs to the Indianapolis campus, not the Bloomington campus."  Dkt. 165 at 13.  Dr. Haynes tenders this information to bolster his statement that "**no** tenured African American male is employed at the Indiana University School of Education in Bloomington."  Dkt. 165 at 13. The Court is unclear how this statement assists it to evaluate his race discrimination claims, since there are no allegations of gender discrimination.  Nonetheless, the Court accepts this new information.

Finally, Dr. Haynes claims that the Court's July 31, 2017, Order contained a factual error; namely, the Court failed to recognize that the reports of Drs. Perna and Greenwald were used to respond to Defendants' qualified immunity defense.  The Court has already addressed this argument above.  *See* pt. III, A, 3.  Dr. Haynes' submission of the full expert reports of Drs. Perna and Greenwald does not comport with the Court's July 31, 2017 Order and they will not be considered.

For the reasons set forth above, Dr. Haynes' Motion to Reconsider is **GRANTED in part and DENIED in part**.

## B. EQUITABLE TOLLING

In Indiana, a plaintiff must file a charge of discrimination "within 300 days of the occurrence of the act that is the basis of the complaint." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445 (7th Cir. 1994). Failure to file within the 300 days renders the claim "time-barred" and precludes recovery. *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 460 (7th Cir. 2007). "The 300-day limit … begins to run when the defendant has taken the action that injures the plaintiff and when the plaintiff knows [he] has been injured … not when [he] determines that the injury was unlawful." *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001) (quotation marks and citations omitted).

Dr. Haynes filed his charge of discrimination on April 10, 2015, approximately 380 days after he was notified of the University's decision not to grant him tenure. Dkt. 1-1. Dr. Haynes argues that his claim should survive under the theory of equitable tolling. "Equitable tolling may only extend a deadline when 'despite all due diligence, a plaintiff cannot obtain the information necessary to realize that he may possibly have a claim.'" *Jones v. Res-Care, Inc.*, 613 F.3d 665, 670 (7th Cir. 2010) (quoting *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 860 (7th Cir. 2005)). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently; and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). Even when equitable tolling is applicable, "the court does not grant the plaintiff a fresh 300 days to file his charge once he obtains enough information to suspect discrimination; he must file his charge with the EEOC within a reasonable time." *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 268 (7th Cir. 1995).

Dr. Haynes claims that he was not reasonably aware of his discrimination claim until March 2015, and therefore he only waited for a few weeks before submitting his charge of discrimination with the EEOC. He asserts that the information he received in March 2015 following a Freedom of Information Act request contained "key documents" that provided evidence of discrimination based on Haynes' race. Dkt. 94 at 18. He specifically admits in his Complaint, however, that "on or around October 24, 2014, was the first time that Dr. Haynes suspected or was aware of racial discrimination against him." Dkt. 1, ¶ 64.[8] "Judicial admissions are formal concessions in the pleadings, or stipulations by the party or its counsel, that are binding upon the party making them." *Keller v. United States*, 58 F.3d 1194, 1198 n. 8 (7th Cir. 1995). Dr. Haynes' own Complaint explicitly acknowledges that he learned of the alleged discriminatory acts that formed the basis of his Complaint in October 2014.

Dr. Haynes' assertion that the "key documents" provided in March 2015 provided him the information necessary to put the pieces together is baseless. Tellingly, the evidence cited by Dr. Haynes does nothing to establish any discriminatory intent by the Defendants. He cites: (1) an email from Brush to Boling and Bichelmeyer that suggested he did not fit in with the IST Department; (2) additional emails where Boling and/or Glazewski talked negatively about Haynes behind his back with Tom Brush; and (3) email

---

[8] In his surreply, Dr. Haynes states that the reason that he stated that October 24, 2014, was the first day he suspected racism is because that is when he received his first batch of documents and that he wrote that date on the emails that date when he received them. Dkt. 161-4, ¶¶ 5-6. Dr. Haynes could have stated in his Complaint that this is when he first began to receive documents from the University relating to his FOIA request, which the University concedes, but chose not to. In fact, October 24, 2014, was the first date that the University produced documents relating to his claim. This explanation does nothing to refute the explicit statement in his Complaint as to when he gained knowledge of his alleged claims and is therefore disregarded.

exchanges between James Klein and Brush showing that Brush was improperly speaking directly with his proposed external reviewer about what he thought Haynes' external review should say.  Dkt. 94 at 18.[9]  Dr. Haynes claims that only after receiving this information in March 2015 did he "finally underst[and] that he had been discriminated against on the basis of his race, African American."  Dkt. 94 at 18.  Yet none of the information cited by Dr. Haynes provides any indication of discriminatory animus during his tenure process or provides the "extraordinary circumstance" that he finally overcame to discover that he had been discriminated against.  *Pace*, 544 U.S. at 418.  Having failed to meet this burden, Dr. Haynes' equitable tolling argument must fail and his Complaint is untimely as a matter of law.

## C. DISCRIMINATION CLAIMS

Even if the Court could conclude that Dr. Haynes is entitled to equitable tolling and find that his claims, which are brought under both Title VII and 42 U.S.C. § 1981, are not time barred, they fail as a matter of law on the merits.

Courts "generally have applied the same prima facie requirements to discrimination claims brought under Title VII and section 1981."  *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007) (citations omitted).  Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]"  42 U.S.C. § 2000e-2(a)(1).  To establish a claim under Title VII, a "plaintiff must prove that he engaged in protected activity and suffered an adverse employment action, and that there is a causal

---

[9] Dr. Haynes did not provide citations for the first two email exchanges.

link between the two." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016).

As the Seventh Circuit recently instructed, a claim may survive summary judgment if "the evidence would permit a reasonable factfinder to conclude that the plaintiff's race … caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The Court need not separate direct and indirect evidence into separate legal standards. *Id.* *Ortiz*, however, did not alter the burden-shifting framework set forth by *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See David v. Bd. of Trs. of Cmty Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Notably, with respect to tenure decisions, "although the legal standard is the same whether the plaintiff in an employment discrimination case is a salesman or a scientist, practical considerations make a challenge to the denial of tenure at the college or university level an uphill fight." *Blasdel v. Northwestern Univ.*, 987 F.3d 813, 815 (7th Cir. 2012). This uphill fight is due to "the absence of fixed objective criteria for tenure at that level." *Id.* Even so, "faculty votes should not be permitted to camouflage discrimination, even the unconscious discrimination of well-meaning and established scholars." *Namenwirth v. Bd. of Regents of Univ. of Wisc. Sys.*, 769 F.2d 1235, 1243 (7th Cir. 1985). However, "'in the absence of clear discrimination,' [courts] are generally 'reluctant to review the merits of tenure decisions,' recognizing that 'scholars are in the best position to make the highly subjective judgments related to the review of scholarship and university service.'" *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 667 (7th Cir. 2007) (citing *Farrell v. Butler Univ.*, 421 F.3d 609, 616 (7th. Cir. 2005)).

Since Dr. Haynes has not introduced any direct evidence that the Defendants discriminated against him because of his race, he presents his case under the indirect, burden-shifting method under the *McDonnell Douglas* framework. To satisfy the first step of this analysis, "the plaintiff must establish a *prima facie* case of discrimination." *Rhodes v. Ill. Dep't Transp.*, 359 F.3d 498, 504 (7th Cir. 2004), *abrogated on other grounds by, Ortiz*, 834 F.3d 760. To do so, Dr. Haynes must demonstrate that he: (1) is a member of a protected class; (2) was performing his job satisfactorily; (3) experienced an adverse employment action; and (4) similarly situated individuals were treated more favorably. *Id.* If the plaintiff satisfies this initial burden, the burden shifts to the employer to produce "a legitimate, non-discriminatory reason for its employment action, and in response the plaintiff must prove that the employer's proffered non-discriminatory reason is a pretext for discrimination." *Id.* Defendants do not dispute that Dr. Haynes satisfies the first and third prongs; therefore, the Court focuses its analysis on the second and fourth prongs.

### 1. *Prima Facie* Case

Dr. Haynes attempts to establish his *prima facie* case for race discrimination by showing that he was qualified for tenure and that Dr. Leftwich was a similarly situated non-African American who received tenure the year before Dr. Haynes. The only evidence proffered by Dr. Haynes for this suggestion, however, is Dr. Perna's declaration, which concludes that "Haynes' research record is at least comparable to that of [Leftwich]." If [Leftwich]'s record demonstrated 'excellence' in research, then so does the record of Haynes." Dkt. 102-14 at 4. The Court has already determine that this evidence is inadmissible. *See supra* pt. III, A, 1.

Even accepting that Dr. Perna's assessment that Dr. Haynes' dossier was comparable to Dr. Leftwich's, however, does not aid the Court in finding a discriminatory purpose; "because tenure decisions typically involve numerous layers of review by independent and University-wide committees, the causal connection between possible discriminatory motive of a subordinate participant in the tenure process and the ultimate tenure decision is weak or nonexistent." *Adelman-Reyes*, 500 F.3d at 667 (quotation marks and citation omitted). "Given the nuanced nature of [tenure] decisions, we generally do not 'second-guess the expert decisions of faculty committees.'" *Sun v. Bd. of Trs. of the Univ. of Ill.*, 473 F.3d 799, 815 (7th Cir. 2007) (quoting *Vanasco v. Nat'l Louis Univ.*, 137 F.3d 962, 968 (7th Cir. 1998). Eight other faculty members voted to grant Dr. Haynes tenure based on his dossier; 19 voted against. The fact that Dr. Perna holds a different opinion on Dr. Haynes' research than 19 of Dr. Haynes' colleagues does little to benefit this case "in the absence of clear discrimination." *Farrell*, 421 F.3d at 616. Dr. Perna's declaration provides no indication that the other 19 faculty members' votes were made in error, much less any indication that the votes were cast with discriminatory intent. And, as explained more fully above, simply counting the number of publications is insufficient. *See supra* pt. III, A, 1. Thus, Dr. Haynes has failed to establish that he was qualified for tenure and his *prima facie* case must fail.

## 2. Pretext

Even if Dr. Haynes could establish a *prima facie* case for discrimination, the Defendants have articulated a non-discriminatory reason for denying him tenure that is not pretextual. Multiple individuals and groups reviewed Dr. Haynes' dossier and the majority found that Dr. Haynes' research did not rise to the University's standard of

excellence. To establish "that an employer's proffered reason is pretextual, a plaintiff must do more than demonstrate that the employer made a mistake or that the employer's reason was not good enough to support its decision. … Instead, the plaintiff must demonstrate that the employer's reason is unworthy of belief." *Koski v. Standex Int'l Corp.*, 307 F.3d 672, 677 (7th Cir. 2002) (citations omitted). "Specifically, the plaintiff must show that the 'nondiscriminatory' reason is not the real reason at all, but is instead nothing but a cover-up for discrimination." *Id.* (citing *Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996)). To demonstrate this, Dr. Haynes may show that: "(1) the proffered reasons are factually baseless; (2) the proffered reasons were not the actual motivation for the discharge; or (3) the proffered reasons were insufficient to motivate the discharge." *Wolf*, 77 F.3d at 914.

Dr. Haynes offers two arguments that this decision was pretextual: (1) Dr. Haynes was held to a stricter standard than Drs. Cho and Leftwich; and (2) numerous irregularities occurred during his tenure review process.[10] For the former contention, Dr. Haynes merely concludes that, because Dr. Perna found Dr. Haynes' research on par with Dr. Leftwich, Dr. Haynes' tenure review must have been held to a stricter standard. But even

---

[10] Dr. Haynes also claims that racial discrimination may be inferred because "[i]n over 100 years, no other African American male has ever received tenure from IU's School of Education, suggesting a bias against African American males like Haynes. This shows a disparate impact." Dkt. 94 at 32. Dr. Haynes fails to develop his disparate impact theory in any way; rather he merely cites to more alleged irregularities in his tenure review process, which fails to establish how these irregularities are consequential to his discrimination or disparate impact claims. *See* dkt. 94 at 32-34. Moreover, Dr. Haynes fails to cite any authority for this line of reasoning. Accordingly, Dr. Haynes' undeveloped argument is waived. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

accepting that Dr. Haynes was held to a stricter standard does not establish that the reason for doing so was discriminatory.

Similarly, Dr. Haynes' claim that "numerous irregularities occurred" during his tenure process is not enough to demonstrate pretext. Dr. Haynes once again cites the inadmissible opinion of Dr. Perna who concluded that "various aspects of the promotion and tenure process were not appropriately executed for Haynes," and "[p]artiularly problematic is the selection of his external reviewers." Dkt. 102-14 at 4. But even accepting this conclusory allegation as true, Dr. Haynes has failed to demonstrate that his tenure review suffered these irregularities because he was African American. Despite Dr. Haynes setting forth a litany of alleged irregularities during his tenure review process, *see* dkt. 94 at 26-31, he is unable to show how any of these irregularities serves as "a cover-up for discrimination." *Koski*, 307 F.3d at 677. Simply put, Dr. Haynes has failed to set forth any evidence that "would permit a reasonable factfinder to conclude that [his] race … caused the … adverse employment action." *Ortiz*, 834 F.3d at 765.

Absent any evidence to the contrary, the University's decision to deny Dr. Haynes' tenure was not done with the intent to discriminate against him because of his race. Accordingly, Dr. Haynes' discrimination claims, which are brought under both Title VII and 42 U.S.C. § 1981, fail as a matter of law.

### 3. Qualified Immunity

Because the Court has concluded that Dr. Haynes has failed to evidence discrimination in his tenure decision, the Court declines to address the qualified immunity arguments.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Strike. Dkt. 117. Dr. Haynes' Surreply Motion is **DENIED as MOOT**. Further, the Court **STRIKES** the full expert reports of Drs. Perna and Greenwald submitted with Dr. Haynes' Surreply in Opposition. Dkts. 161-2, 161-3. Dr. Haynes' Motion to Reconsider is **GRANTED in part and DENIED in part**. Dkt. 165. Finally, Defendants' Motion for Summary Judgment is **GRANTED**. Dkt. 66.

SO ORDERED this 18th day of August, 2017.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

Distribution:

Sandra L. Blevins
BETZ & ASSOCIATES
sblevins@betzadvocates.com

Courtney E. Endwright
BETZ & BLEVINS
cendwright@betzadvocates.com

Kevin W. Betz
BETZ & BLEVINS
kbetz@betzadvocates.com

Melissa A. Gardner
TAFT STETTINIUS & HOLLISTER LLP
mgardner@taftlaw.com

Michael C. Terrell
TAFT STETTINIUS & HOLLISTER LLP
mterrell@taftlaw.com

Michele Lee Richey
TAFT STETTINIUS & HOLLISTER LLP
MRichey@taftlaw.com